# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| ERIC WILLIAMSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION 10-0181-WS-N |
| | ) |
| CLARKE COUNTY DEPARTMENT OF | ) |
| HUMAN RESOURCES, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## ORDER

This matter comes before the Court on Defendants' Motion for Summary Judgment (doc. 17). The Motion has been briefed and is ripe for disposition.

**I. Nature of the Case.**

Plaintiff, Eric Williamson, brought this action against defendants, the Clarke County Department of Human Resources ("CCDHR") and the State of Alabama, asserting causes of action for employment discrimination under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*, and the Rehabilitation Act, 29 U.S.C. §§ 791 *et seq.* The Complaint (doc. 1) alleges that plaintiff repeatedly requested reasonable accommodations for his disability, and that such accommodations would have permitted him to perform the essential functions of his job. According to the Complaint, however, CCDHR refused to provide such accommodations, and instead terminated his employment because of his disability. Plaintiff's claims sound in theories of failure to provide reasonable accommodation, as well as discriminatory discharge. Williamson seeks an award of monetary damages, declaratory relief, and reinstatement, plus attorney's fees and costs.

## II.     Relevant Background.[1]

### A.     *Plaintiff's Employmant at CCDHR.*

Williamson was hired by defendant CCDHR as a social service case worker in the Child Welfare Unit, effective September 18, 2006. (Boykin Aff. (doc. 17, Exh. 1), at 1.) In this capacity, Williamson's job involved working with foster children in CCDHR's custody, including duties such as monitoring their cases, providing or arranging for services for foster children and foster parents, maintaining case files, and documenting case information. (*Id.* at 2.) Williamson's "most important function" was to make sure that those children were kept safe and were protected from abuse and neglect. (*Id.* at 1-2.)

From November 2006 through 2008, Williamson's direct supervisor was Kimberly Guidroz-Oputa. (Guidroz-Oputa Aff. (doc. 19), at 1-2.) During 2008, Williamson was supervised by Iola Williams. (*Id.*) Following Williams' retirement in 2009, however, Guidroz-Oputa resumed her direct supervision of Williamson, and continued in that capacity until plaintiff's dismissal in July 2009. (*Id.*) During all relevant times, Lou Boykin was the director of the CCDHR. (Boykin Aff., at 1.) As the appointing authority for the CCDHR, Boykin made all hiring and firing decisions for that agency. (*Id.* at 4.)

### B.     *Plaintiff's Medical Condition.*

As early as 1996, Williamson was diagnosed with Attention Deficit Disorder with Hyperactivity ("ADHD"). (Williamson Aff. (doc. 30-2), at 1.) Plaintiff testified that he has intermittently been under physicians' care for this condition, for which he has sometimes been prescribed Adderall or other medications. (Williamson Dep. (doc. 21), at 58-65.)[2] According to

---

[1]     The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party, resolving all reasonable doubts about the facts in favor of the non-movant. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). Thus, plaintiff's evidence is taken as true and all justifiable inferences from the record are drawn in his favor.

[2]     The Court notes that both sides have submitted complete deposition transcripts in support of their respective positions on summary judgment. This practice runs afoul of the Local Rules, which provide that "[i]f discovery materials are germane to any motion or response, only the relevant portions of the material shall be filed with the motion or response." LR 5.5(c). The Court will not scour uncited portions of the summary judgment record for evidence that might bolster either side's arguments. *See* Rule 56(c)(3), Fed.R.Civ.P. (on summary judgment, "[t]he court need consider only the cited materials"); *Sharpe v. Global Sec. Int'l*, --- F. Supp.2d ----, (Continued)

plaintiff, his ADHD condition affected his performance at CCDHR by interfering with his ability to concentrate and causing him to be easily distracted. (*Id.* at 68-69.) As Williamson put it, if he "got constant traffic in and out, I will lose track with what I'm doing. I will move on to something different and leave something undone." (*Id.* at 69.)

As of early 2009, Williamson was not under a physician's care for his ADHD. At that time, he received a "supervisory referral" to the agency's Employee Assistance Program ("EAP") by his then-supervisor, Iola Williams, for ongoing performance issues. (Williamson Dep., at 63-64.)[3] Pursuant to that EAP referral, Williamson was seen by David D. Harwood, M.D., who began treating Williamson in February 2009 for ADHD, via routine office visits and prescribed medication. (*Id.* at 65-66; doc. 30-5.)

Plaintiff's evidence is that on one occasion, he notified his immediate supervisor, Guidroz-Oputa, on a driving trip to Mobile that he suffered from ADHD and that he had issues with being able to concentrate. (Williamson Dep., at 69.)[4] On other occasions, Williamson testified, he told both Guidroz-Oputa and Williams that he was "overwhelmed" and said that he "needed time to do" his main duties, such that he was requesting additional time. (*Id.* at 70-71.) In his words, Williamson "said I was overwhelmed and needed time to do – too many job

---

2011 WL 386859, *5 n.9 (S.D. Ala. Feb. 2, 2011) (on summary judgment, "the Court … will not independently examine uncited portions of the record in search of support for a particular proposition").

[3] On its face, this referral was not grounded in any disclosure by Williamson of his ADHD condition. Rather, the form completed by Williams and dated January 15, 2009 reflected that she was referring him to the EAP because his work errors had increased, he was failing to meet schedules, he was forgetful of assignments, he showed poor concentration in performing tasks, he was not following recommendations, and he was disregarding policies, rules and procedures. (*See* doc. 23-2, at 161.) On March 3, 2009, Behavioral Health Systems notified Williams in writing of the results of the EAP referral, to-wit: That Williamson had been evaluated by a physician, and that it was recommended that he continue unspecified medication management every 1-3 months, that he continue working, and that work-related issues be handled administratively. (*See id.* at 162.) The March 3 letter did not identify Williamson's medical condition or otherwise place CCDHR on notice that plaintiff had a disability for which he required reasonable accommodation.

[4] Plaintiff also maintains that he made reference to his ADHD diagnosis in "informal conversation" with Williams during the 2007-2008 period. (Williamson Aff., at 2.)

duties." (*Id.* at 72.) When asked whether he related these for requests for modification of his job back to his ADHD in conversations with CCDHR officials, however, Williamson responded, "Not directly." (*Id.* at 72.) Thus, Williamson admits that he did not tell his supervisors that he was requesting adjustment of his job duties as an accommodation for a disability.

Nonetheless, Williamson's evidence is that he notified Williams in January 2009 that a reduction in workload (and, specifically, intake responsibilities) would enable him to complete his primary duties. (Williamson Aff., at 2.)[5] According to plaintiff, "All I wanted from CCDHR was a reduction in my duties which could be a limit on intake duties which include having others to input information into the Department system. … Reduction in duties would have allowed me to complete the duties of a social service caseworker satisfactorily." (*Id.* at 3.) The summary judgment record reflects that CCHDR reduced his caseload, but not his intake responsibilities. (Boykin Dep., at 35-38.) Plaintiff's failure-to-accommodate claim in this action turns on his contention that defendants wrongfully refused to reduce his intake duties as an accommodation for his disability.

Williamson admits that he never discussed his ADHD condition with Lou Boykin, the CCDHR's director and the decisionmaker for the challenged termination decision. (Williamson Dep., at 70.) It is uncontroverted that plaintiff never informed Boykin that he had a disability and never requested an accommodation from her directly. (Boykin Aff., at 5.)

That said, plaintiff concedes in his summary judgment brief that he met with his immediate supervisor (Guidroz-Oputa) and Boykin after he disclosed his ADHD diagnosis to Guidroz-Oputa. (Doc. 30, at 2, 5.)[6] This meeting came about because, when plaintiff notified

---

[5] There is documentary evidence supporting plaintiff's stance. Handwritten notes (apparently written by Iola Williams) on a form concerning a conference with Williamson dated January 26, 2009, state the following: "Duties: Too many – overwhelm  Need time to do the work." (Plaintiff's Exh. 7 (doc. 30-7); *see also* Boykin Dep., at 47.)

[6] In particular, Williamson argues in his brief that "Plaintiff met with Boykin and his immediate supervisor concerning his report that he had a disability," and that he "did advise Clarke County DHR of this disability, and had a meeting with his supervisor and Clarke County DHR director Lou Boykin." (Doc. 30, at 2, 5.) There is some tension between these assertions in plaintiff's brief and Williamson's statement in his affidavit that "Ms. Lou Boykin stated in deposition testimony that we had a meeting regarding my disability statement no such meeting happened to my knowledge." (Williamson Aff., at 3.) Plaintiff cannot have it both ways. Either there was or was not a meeting. Because he has emphatically taken the position in his brief (and (Continued)

Guidroz-Oputa during a work-related drive to Mobile that he had ADHD, Guidroz-Oputa promptly informed Boykin of that conversation upon their return to CCDHR. (Guidroz-Oputa Aff. (doc. 19), at 2.) Upon receiving this second-hand report, Boykin called Williamson and Guidroz-Oputa into her office to discuss the matter. (Boykin Aff., at 5; Guidroz-Oputa Aff., at 2.) During this meeting, Boykin questioned Williamson "as to whether or not he made that statement or whether or not he had that condition." (Boykin Dep. (doc. 30-3), at 26.) In response, Williamson said nothing, but "just looked at [Boykin] really, really funny." (*Id.*) Boykin characterized plaintiff's response as "a facial appearance as if he really didn't know what [Boykin] was talking about." (*Id.* at 30.) So Boykin advised Williamson that if he wished to request an accommodation, he must provide medical information to Boykin, who in turn would pass it along to the state DHR office for consideration. (Boykin Aff., at 5; Boykin Dep., at 26, 30, 39.)[7]

It is undisputed that Williamson never submitted any medical documentation or completed a written form to request reasonable accommodation. (Williamson Dep., at 72-73;

---

has constructed his summary judgment argument on the premise) that there <u>was</u> a meeting with Boykin after he reported his ADHD condition to Guidroz-Oputa, the Court will hold him to that position. He cannot create a genuine issue of material fact on summary judgment by stating the facts one way in his affidavit, and another way in his brief. *See generally Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (explaining that "we accept the nonmovant's version of the events when reviewing a decision on summary judgment," without picking and choosing bits from incompatible accounts to string together "the story that we deem most helpful to the nonmovant"). Having staked himself on summary judgment to a position that he did meet with Boykin and Guidroz-Oputa concerning his disability, and having asked the Court to find that such a meeting did happen, plaintiff cannot be heard to argue otherwise in his exhibits.

[7] Under CCDHR policy, which is prescribed in the State DHR Personnel Policies and Procedures Manual, an appointing authority such as Boykin cannot make decisions on employee requests for reasonable accommodation, but must refer such written requests to the state DHR office. (Boykin Aff., at 5.) Thus, all DHR employees' requests for reasonable accommodation are routed to the DHR State Office of Civil Rights/Equal Employment in Montgomery for review and approval. (Jackson Aff., at 1-2; Boykin Dep., at 25.) A copy of the standard form used by DHR employees to request accommodation is found in the record at page 52 of Defendant's Exhibit 6 (doc. 21).

Boykin Aff., at 5; Jackson Aff. (doc. 20), at 2.)[8] Moreover, Williamson never said anything to Boykin thereafter about having a disability or desiring a reasonable accommodation. (Boykin Aff., at 5; Boykin Dep., at 26.)[9] Boykin never heard of Williamson making an accommodation request to anyone else at CCDHR. (Boykin Dep., at 30.) Boykin did not follow up with Williamson about this matter because, she explained, "[i]t's the responsibility of the worker requesting the accommodation to make a formal request." (*Id.* at 31-32.) Plaintiff admits that he never provided defendants with any documentation from any doctor concerning his ADHD. (Williamson Dep., at 73.) He further admits that the lone document that anyone submitted to CCDHR regarding his condition was the March 2009 Behavioral Health Systems letter, which said nothing about Williamson having a disability or requiring reasonable accommodation. (*Id.* at 66, 73.) Therefore, as far as Boykin and CCDHR were concerned, that was the end of that.

### C. *Termination of Plaintiff's Employment.*

Williamson experienced a series of documented performance problems and disciplinary actions during his employment at CCDHR. For example, in October 2007, Guidroz-Oputa issued a written reprimand to him for various shortcomings, including "delinquent case dictation, failure to complete ISP's timely, failure to mail out ISP's, failure to make home and school

---

[8] Plaintiff's only rejoinder on this point in his summary judgment brief is an assertion that "Boykin admits that she never told the Plaintiff the steps that he should take in response, such as completing a request for accommodation." (Doc. 30, at 2.) But Boykin testified as follows: "I suggested that he get something in writing from his doctor and I would send it to personnel and to EEOC, who handles requests for accommodations." (Boykin Dep., at 30.) Although she indicated in her deposition that she did not expressly refer Williamson to DHR's reasonable accommodation request form, Boykin's testimony is consistent and unambiguous that she "asked him to submit the medical information so [she] could send it to EEOC." (*Id.* at 39.) Plaintiff does not deny that Boykin made such a statement. There is no indication and no reason to believe that she would not have forwarded any such information to the state DHR office, had Williamson ever provided it (which he did not). And there is no record evidence that the state DHR would have rejected such information and request unless they were submitted on a particular form. Thus, plaintiff cannot make out a Rehabilitation Act or ADA violation by pointing out that Boykin failed to mention the DHR accommodation request form to plaintiff at the meeting, where she did inform him of a viable means for requesting accommodation and he never followed up on that guidance.

[9] The same is true with respect to supervisor Guidroz-Oputa, who avers that following the meeting with Boykin and Williamson, he never informed her "that he wanted an accommodation of any type due to ADHD or any other disability." (Guidroz-Oputa Aff., at 3.)

visits, providing false information about case work, lack of ACWIS data entry, falling asleep in meetings, failure to return phone calls, [and] failure to obey supervisor's requests." (Def. Exh. 3, at 107.) In April 2008, Boykin suspended plaintiff for two weeks without pay, citing "failure to comply with agency rules and the expectations of [his] position." (Def. Exh. 3, at 184.)[10]

In May 2009, Boykin issued a charge letter advising Williamson that a disciplinary hearing had been scheduled based on allegations that his work performance was unsatisfactory. (Def. Exh. 3, at 32-35.) This charge letter recited a lengthy laundry list of alleged policy violations by plaintiff, including failure properly to conduct investigations in child abuse/neglect cases, failure to implement safety plans to protect children, accumulation of pending cases in excess of 90 days, failure to document case activity, authorization of services and case activity that were not in accordance with DHR policy, incomplete day care records, failure to perform safety checks in day cares and complete deficiency forms, maintenance of incomplete foster care home records, sleeping on the job, failure to follow policy and supervisory directives, and failure to submit dictation. (*Id.* at 33.) The letter also identified specific instances in which Williamson failed to complete safety plans for children, failed to obtain supervisory approval of such plans before implementing them, and failed to perform required site visits to ensure that children were safe and secure.

An administrative hearing was conducted on July 14, 2009. Thereafter, a hearing officer recommended to Boykin that Williamson's employment be terminated immediately for failure to perform his job properly (including failure to license and monitor foster homes, and to license and maintain day care homes, as required by DHR policy), safety violations that placed children at risk (including placing children in improper or unlicensed foster homes, and attendance of children at unlicensed family day care homes), and insubordination (namely, failure to follow plans established by supervisors). (*Id.* at 37.) Boykin adopted that recommendation and terminated Williamson's employment effective July 20, 2009. (*Id.* at 36; Boykin Aff., at 4.) The ultimate decision to discharge Williamson was Boykin's alone. (Boykin Aff., at 4.)[11]

---

[10] The specific incidents precipitating that suspension included Williamson's failure "to protect a three year old child from being around a sex offender," his no-show for a supervised visit between foster children and their parents, and his dishonesty. (*Id.*)

[11] In his summary judgment brief, plaintiff concedes that Boykin has the sole authority to hire and fire employees of CCDHR. (*See* doc. 22, at 4; doc. 30, at 1.)

Plaintiff appealed his termination to the State of Alabama Personnel Board. (Boykin Aff., at 4.) Following a hearing, an Administrative Law Judge entered a 21-page written recommendation, finding that the totality of the evidence supported termination and recommending that Williamson's dismissal be upheld. (Def. Exh. 6 (doc. 21), at 26-46.) On December 22, 2009, the Personnel Board entered a written order adopting the findings of fact and conclusions of law as found by the ALJ, and affirming Boykin's decision to fire Williamson. (*Id.* at 47-51.) This action followed.

### III. Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004). Rather, "the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." *Id.* at 1086 (citation omitted).

**IV.    Analysis.**

Recall that plaintiff's Complaint is couched in terms of both failure to provide reasonable accommodation and discriminatory discharge. Defendants seek entry of summary judgment on both theories.[12]

*A.    Failure to Provide Reasonable Accommodation.*

Williamson maintains that CCDHR violated the ADA and Rehabilitation Act by refusing his requests for reasonable accommodation for his disability, Attention Deficit Hyperactivity Disorder.[13] Specifically, plaintiff says that CCDHR unlawfully rejected his request for a reduction in intake responsibilities to allow him to focus on his other duties. Defendants contend that this cause of action should be dismissed because plaintiff never requested a reasonable accommodation.

As a threshold matter, the law is clear that "an employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA, so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship." *Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007); *see also Crutcher v. Mobile Housing Bd.*, 2005 WL 2675207, *11 (S.D. Ala. Oct. 20, 2005) ("It is well settled that an ADA violation occurs when an employer fails to provide 'reasonable accomodations' for an

---

[12]    Williamson has asserted his claims under both the Americans with Disabilities Act and the Rehabilitation Act. As a general proposition, the same legal standards govern both statutes and decisional authority applying one or the other may be used interchangeably. *See, e.g., Allmond v. Akal Sec., Inc.*, 558 F.3d 1312, 1316 n.3 (11th Cir. 2009) ("Because the same standards govern discrimination claims under the Rehabilitation Act and the ADA, we discuss those claims together and rely on cases construing those statutes interchangeably."); *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("The standard for determining liability under the Rehabilitation Act is the same as that under the Americans with Disabilities Act …; thus, cases involving the ADA are precedent for those involving the Rehabilitation Act.").

[13]    A mere diagnosis of ADHD, without more, may not suffice to establish disabled status under the ADA or the Rehabilitation Act. *See generally Simpson v. Alabama Dep't of Human Resources*, 2009 WL 325632 (11th Cir. Feb. 11, 2009) (affirming summary judgment against DHR social worker with ADHD on grounds that plaintiff had failed to show that he was "disabled" as defined by the Rehabilitation Act); *Calef v. Gillette Co.*, 322 F.3d 75, 86 (1st Cir. 2003) ("ADHD might disable an individual such that the ADA applies," but "[m]erely pointing to a diagnosis of ADHD is inadequate" to establish disability). Nonetheless, the Court assumes (without deciding) that plaintiff's ADHD condition substantially limits one or more of his major life activities, thereby qualifying him as disabled.

employee with a disability, unless doing so would impose an undue hardship on the employer."). To state a *prima facie* claim for failure to accommodate, the plaintiff must show that: (i) he is disabled; (ii) he is a qualified individual; and (iii) he was discriminated against by defendant's failure to provide a reasonable accommodation. *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001). Defendants' Rule 56 Motion challenges whether plaintiff has made a sufficient showing as to the third element of a *prima facie* case.

In the reasonable-accommodation context, the ADA "envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *Harris v. Mills*, 572 F.3d 66, 75 (2nd Cir. 2009); *see also* 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. The process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."). Because the interactive process imposes mutual obligations on employers and employees, an employer cannot be liable for failure to accommodate if a breakdown in that process is attributable to the employee. *See E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005) ("If a disabled employee shows that her disability was not reasonably accommodated, the employer will be liable only if it bears responsibility for the breakdown of the interactive process."); *Toronka v. Continental Airlines, Inc.*, 2011 WL 493101, *5 (5th Cir. Feb. 14, 2011) ("An employer is not, however, liable if the breakdown in the interactive process is traceable to the employee."); *Carroll v. England*, 321 F. Supp.2d 58, 69 (D.D.C. 2004) ("when the duty to reasonably accommodate arises, both employee and employer must exchange essential information and neither side can delay or obstruct the process").

The fundamental legal principle on which Williamson's failure-to-accommodate claim founders is that an employer's "duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999). Indeed, "before an employer's duty to provide reasonable accommodations – or even to participate in the 'interactive process' – is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on notice." *E.E.O.C. v. C.R. England, Inc.*, --- F.3d ----, 2011 WL 1651372, *15 (10th Cir. May 3, 2011); *see also Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 23 (1st Cir. 2004)

(request for accommodation "must be sufficiently direct and specific" to give rise to employer's duty to provide reasonable accommodation). What, then, is an "adequate request"? Case authorities are legion for the proposition that, at a minimum, the employee must request some change or adjustment in the workplace <u>and</u> must link that request to his disability, rather than simply presenting the request in a vacuum. *See, e.g., E.E.O.C. v. Chevron Phillips Chemical Co.*, 570 F.3d 606, 621 (5th Cir. 2009) (to trigger duty to provide reasonable accommodation, the employee "must explain that the adjustment in working conditions or duties she is seeking is for a medical condition-related reason"); *Freadman v. Metropolitan Property and Cas. Ins. Co.*, 484 F.3d 91, 102 (1st Cir. 2007) (employee's request for reasonable accommodation "(1) must be sufficiently direct and specific, and (2) must explain how the accommodation requested is linked to some disability") (citations and internal quotation marks omitted).[14]

These decisions are reinforced by the Equal Employment Opportunity Commission's enforcement guidance for the ADA. In that document, the EEOC set forth its position that an employee requesting a reasonable accommodation "must let the employer know that s/he needs an adjustment or change at work for a reason related to a medical condition." *Enforcement*

---

[14] *See also C.R. England*, 2011 WL 1651372, at *16 (although no magic words or talismanic language are needed, the employee's notice or request "must make clear that the employee wants assistance for his or her disability") (citation and internal quotation marks omitted); *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 506 (3d Cir. 2010) ("[E]ither by direct communication or other appropriate means, the employee must make clear that the [he/she] wants assistance for his or her disability.") (citation and internal quotation marks omitted); *E.E.O.C. v. Convergys Customer Management Group, Inc.*, 491 F.3d 790, 795 (8th Cir. 2007) (disabled employee must initiate the accommodation process by providing "relevant details of his disability and, if not obvious, the reason that his disability requires an accommodation"); *Zivkovic v. Southern California Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002) (employee requesting accommodation must "inform the employer of the need for an adjustment due to a medical condition") (citation omitted); *Cato v. First Federal Community Bank*, 668 F. Supp.2d 933, 946 (E.D. Tex. 2009) ("[a] request for accommodation must explain that the adjustment in working conditions or duties she is seeking is for a medical condition-related reason") (citation and internal quotation marks omitted); *Salgado-Candelario v. Ericsson Caribbean, Inc.*, 614 F. Supp.2d 151, 169 (D.P.R. 2008) (for employee's request to be sufficient, "[a]t the least, the request must explain how the accommodation requested is linked to some disability," as opposed to being merely "a mundane request for a change at the workplace") (citation omitted); *Brown v. Paulson*, 541 F. Supp.2d 379, 386 (D.D.C. 2008) (for reasonable accommodation claim under Rehabilitation Act, "[t]he accommodation must be tied to a specific disability raised by a plaintiff in his or her request for accommodation") (citations omitted).

*Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act*, 2002 WL 31994335, *4 (E.E.O.C. Guidance Oct. 17, 2002) (explaining, by way of example, that employee's request for a new chair, without more, is insufficient to request reasonable accommodation where employee "does not link his need for the new chair with a medical condition").

Viewing the evidence in the light most favorable to Williamson, he informed Guidroz-Oputa and Williams in 2007 and 2008 "during informal conversation" that he had been diagnosed with ADHD, and he notified Williams in January 2009 that he felt "overwhelmed" at work and that a reduction in intake responsibilities would allow him additional time to complete his other job duties. Plaintiff's insuperable problem is that he never connected the dots. That is to say, plaintiff did not notify his supervisors at the time he asked for an adjustment of work duties that the reason for his request was that he required an accommodation for his medical condition. By his own admission, Williamson never informed CCDHR that he was requesting a reduction of his intake duties <u>because of</u> his ADHD.[15] Nor would it have been obvious to a reasonable supervisor that there was a nexus between plaintiff's request for a reduction in job responsibilities and the medical diagnosis he had previously disclosed in casual conversation. For all CCDHR knew, Williamson's request for a reduction in job duties was merely a mundane request for a change at the workplace by an employee who (for non-ADHD reasons, such as a propensity to fall asleep on the job) could not or did not keep up. There are myriad reasons unrelated to a disability why a worker might fail to complete his duties in a timely manner. The law did not require CCDHR to speculate, guess or assume that plaintiff's issues were disability-related, when he never saw fit to inform them of that link.

---

[15] Williamson testified that when he asked for additional time to do his work, he did not relate that request back to his ADHD. (Williamson Dep., at 71-72.) Consistent with Williamson's own testimony, Boykin responded in the negative when asked whether plaintiff had ever advised her or brought to her attention "that he needed the additional – or the reduced caseload because of his disability." (Boykin Dep., at 36.) According to Boykin's unrebutted testimony, Williamson "never asked for anything in terms of a disability accommodation." (*Id.* at 58.) Likewise, Guidroz-Oputa stated (without contradiction by plaintiff's evidence) that plaintiff "never mentioned to [her] that he wanted an accommodation due to ADHD or any other disability." (Guidroz-Oputa Aff., at 3.)

Given these facts, and in light of the above case authorities and EEOC enforcement guidance, the Court finds as a matter of law that plaintiff did not make an "adequate request" to put his employer on notice of his need for reasonable accommodation. As such, CCDHR cannot be liable for failure provide a reasonable accommodation, or for failure to participate in the interactive process, under the ADA or the Rehabilitation Act. Defendants are entitled to summary judgment on this cause of action.[16]

### B.   *Discriminatory Discharge.*

Plaintiff's other claim asserted in this lawsuit is that defendants terminated his employment because of his disability, in violation of the ADA and the Rehabilitation Act.

There being no direct evidence of discrimination, Williamson's claim turns on the traditional *McDonnell Douglas* burden-shifting analysis. *See, e.g., Holly*, 492 F.3d at 1255 ("Under the controlling law in this Circuit, the burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims.") (citation and internal punctuation omitted); *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004) (applying *McDonnell Douglas* circumstantial evidence framework in ADA context); *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001) ("In the absence of direct evidence of discrimination, a plaintiff may establish a *prima facie* case of an ADA violation … using the familiar burden-shifting analysis employed in Title VII employment discrimination cases.")

---

[16] On the topic of reasonable accommodation, one other point merits discussion. Defendants' evidence (which plaintiff has not directly refuted) is that Boykin notified him at a meeting that if he wanted an accommodation for his ADHD, he should submit medical documentation which Boykin would then forward to the state office for review and approval. A similar protocol was outlined in the personnel manual that Williamson received during his employment at CCDHR. Yet he did nothing. Williamson neither submitted medical documentation nor filled out DHR's reasonable accommodation request form. These facts support a conclusion that he failed to participate in the interactive process in good faith, thereby precluding liability for CCDHR on a failure-to-accommodate theory. *See, e.g., Harvey v. America's Collectibles Network, Inc.*, 2011 WL 182864, *8 (E.D. Tenn. Jan. 20, 2011) (where employer requested substantiating medical information, but employee failed to provide it, employee "did not participate in the interactive process in good faith, and … cannot claim that defendant failed to accommodate her under the ADA"). Alternatively, plaintiff's failure to abide by CCDHR's standard procedures for requesting accommodations may, in and of itself, bar his claim. *See Edwards v. U.S. E.P.A.*, 456 F. Supp.2d 72, 103 (D.D.C. 2006) ("[A]n employee's oral request cannot trump an employer's established procedure for requesting and approving disability accommodations.").

(footnote omitted). Under this methodology, the initial burden rests with the plaintiff to establish a *prima facie* case of discrimination, after which the burden of production shifts to the defendant to articulate a legitimate non-discriminatory reason for the challenged action. *See Cleveland*, 369 F.3d at 1193; *Wascura*, 257 F.3d at 1242-43. After a non-discriminatory reason is given, the plaintiff is "left with the ultimate burden of proving that [the employer] intentionally discriminated against her because of her disability." *Cleveland*, 369 F.3d at 1193; *see also Wascura*, 257 F.3d at 1243.

To establish a *prima facie* case of disparate treatment under the ADA and Rehabilitation Act, Williamson must show that: (i) he has a disability; (ii) he is a qualified individual; and (iii) the employer discriminated against him because of his disability. *See Greenberg v. BellSouth Telecommunications, Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007); *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005); *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1226 (11th Cir. 2005).[17]

Defendants argue that plaintiff cannot establish a *prima facie* case of discriminatory discharge because there is no evidence that the decisionmaker possessed actual knowledge of his disability at the time of the termination decision. It is well established in this Circuit that "a decision-maker who lacks actual knowledge of an employee's disability cannot fire the employee 'because of' that disability." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1186 (11th Cir. 2005); *see also Morisky v. Broward County*, 80 F.3d 445, 448 (11th Cir. 1996) ("an employer cannot fire an employee *because of* a disability unless it knows of the disability") (citations and internal quotation marks omitted). Simply put, "an employee cannot be fired 'because of' a disability unless the decisionmaker has *actual* knowledge of the disability." *Cordoba*, 419 F.3d at 1185 (explaining that mere constructive knowledge is not sufficient). Thus, as part and parcel of his *prima facie* showing, plaintiff must come forward with evidence from which a reasonable

---

[17] To be sure, a plaintiff qualifies for ADA protection even if he is not disabled (*i.e.*, even if he does not have "a physical or mental impairment that substantially limits one or more major life activities of such individual"), where he has "a record of such an impairment" or is "regarded as having such an impairment." 42 U.S.C. § 12102(1). In neither his Complaint nor his summary judgment brief has Williamson framed his claims under a "record of impairment" or a "regarded as" theory; therefore, the summary judgment analysis is confined to plaintiff's assertion that CCDHR discriminated against him because of an actual disability.

-14-

factfinder could conclude that the CCDHR official who fired him had actual knowledge of his disability.

It is uncontroverted that Lou Boykin is the appointing authority for CCDHR, that she possesses sole authority to hire and fire its employees, and that she made the decision to terminate Williamson's employment. As such, Boykin's knowledge as of the July 20, 2009 termination date is of crucial importance to defendants' Rule 56 Motion. For her part, Boykin categorically denies awareness of Williamson's disability at that time, stating, "I did not have any information from any source during Mr. Williamson's employment with the CCDHR that indicated that Mr. Williamson had a disability. … I did not perceive Mr. Williamson to be disabled or regard him as disabled in any way. He never said anything to me about a disability …." (Boykin Aff., at 5.)

Plaintiff maintains that there are genuine issues of fact as to Boykin's knowledge of his disability. In particular, Williamson relies on Boykin's testimony that Guidroz-Oputa notified her during plaintiff's employment that he had disclosed his ADHD diagnosis to Guidroz-Oputa. (Boykin Dep., at 25-26.) Plaintiff is thus correct that Boykin received second-hand information that plaintiff had told someone else of his ADHD diagnosis. But this evidence is insufficient to establish the requisite knowledge on Boykin's part. After all, Boykin's testimony is that when Guidroz-Oputa informed her that Williamson had said that he suffered from ADHD, Boykin met with Williamson and "questioned him as to whether or not he made that statement and whether or not he had that condition." (Boykin Dep., at 26.) In response, Williamson simply gave her a strange look, and "did not respond." (*Id.*) So when Boykin asked Williamson to confirm whether he had ADHD, he declined. How could Boykin know that plaintiff was disabled if he refused to confirm it (or even answer her question) when she made an inquiry for purposes of ascertaining whether he needed reasonable accommodation? Based on plaintiff's odd reaction (which he has not contested or disputed on summary judgment), Boykin had no information before her at that time that plaintiff was, in fact, suffering from ADHD. To the contrary, Boykin construed Williamson's expression as showing that "he really didn't know what [she] was talking about." (*Id.* at 30.) Williamson admits that he never told Boykin that he had been diagnosed with ADHD, never requested any accommodation from her, and never submitted any

documentation to her that would show his ADHD status.[18] In light of plaintiff's bizarre response when Boykin asked him point-blank whether he had ADHD, his failure ever to broach the topic again to Boykin, and his failure to follow up on her request for medical documentation in the event he wanted an accommodation, the record is clear that Boykin had no actual knowledge – and no reasonable basis for concluding – that Williamson was in fact disabled. As such, there are no genuine issues of material fact as to whether the decisionmaker knew of plaintiff's disability. Without proof of such knowledge, plaintiff cannot establish a *prima facie* case of disability discrimination under either the ADA or the Rehabilitation Act.

Because the summary judgment record taken in the light most favorable to the nonmovant does not show that the decisionmaker possessed actual knowledge of plaintiff's disability at the time of the challenged personnel action, defendants' Motion for Summary Judgment will be **granted** as to plaintiff's claim of disability discrimination in violation of the Rehabilitation Act and the ADA.[19]

---

[18] Boykin's testimony is unequivocal and uncontradicted that, during Williamson's employment at CCDHR, her "only knowledge … of ADHD and Mr. Williamson really was that meeting" that she convened after learning from Guidroz-Oputa that Williamson had told her that he had ADHD. (Boykin Dep., at 39.) Nonetheless, plaintiff suggests that Boykin was placed on notice of his ADHD status by virtue of "Plaintiff's request for Employee Assistance" and "Plaintiff's disability through a referral." (Doc. 30, at 2-3.) Unquestionably, the record shows that that Boykin was aware of an EAP referral for Williamson in 2007. (Plaintiff's Exhs. 16 &17 (docs. 30-15, 30-16.) But those documents say nothing of the reasons for that referral, much less identify a mental or physical impairment that might place Boykin on notice that Williamson was disabled. Moreover, it is uncontroverted that Boykin never made any inquiries in connection with that EAP referral as to whether or not Williamson had a disability. (Boykin Dep., at 57.) Similarly, Boykin acknowledged being aware of plaintiff's January 2009 referral to EAP for poor performance, and being aware of Behavioral Health Systems' March 2009 letter indicating that Williamson was seeing a physician and continuing "medication management," while being able to work. (Plaintiff's Exh. 3 (doc. 30-6); Boykin Dep., at 42-44.) But those documents say nothing about plaintiff being disabled, and Boykin had no information at that time why Williamson was receiving medication and under a physician's care, much less any knowledge that might have clued her in that plaintiff is disabled. (Boykin Dep., at 42-44.) After receipt of the Behavioral Health Systems letter, Boykin made no inquiries about Williamson's medical condition that might have placed her on notice of his disability. (*Id.* at 43-44.)

[19] Even if plaintiff had been able to show that Boykin knew of his disability, defendants would remain entitled to summary judgment. After all, CCDHR has plainly come forward with a legitimate, nondiscriminatory reason for terminating Williamson's employment (namely, its determination that he had failed to perform his job properly, had committed safety (Continued)

## V. Conclusion.

For all of the foregoing reasons, Defendants' Motion for Summary Judgment (doc. 17) is **granted**, and this action is **dismissed with prejudice**. A separate judgment will enter.

DONE and ORDERED this 8th day of July, 2011.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

violations that placed children at risk, and had engaged in insubordination by failing to follow plans established by his supervisors). Plaintiff cannot meet his burden of showing that these stated reasons were a pretext for disability discrimination. A pre-dismissal hearing officer, a post-dismissal Administrative Law Judge, and the State Personnel Board (none of whom appeared to have any inkling of plaintiff's ADHD) all concluded that termination of Williamson's employment was appropriate for his numerous infractions and violations of DHR policy. In an effort to show pretext, Williamson does not deny that his performance was poor and in violation of policy. He does not assert that non-disabled comparators who committed similar violations were not disciplined similarly. Instead, he asserts that his poor performance was CCDHR's fault because the agency refused to accommodate his disability, even though it accommodated other employees for non-disability related issues by exempting them from intake duty. (*See* doc. 30, at 6 ("To summarize, Plaintiff's … request for accommodations was clearly ignored, and the discharge based on poor job performance was the result.").) This argument thus effectively piggybacks on Williamson's failure-to-accommodate theory. As already explained, however, plaintiff never linked his accommodation request to his ADHD condition; therefore, CCDHR could not have been discriminating against him on the basis of a disability in failing to provide such an accommodation. Simply put, defendants had no knowledge and no reason to believe that Williamson's request to be relieved of intake duty was connected to his disability status. Accordingly, the denial of such an accommodation is not evidence from which a reasonable finder of fact could conclude that CCDHR's stated reasons for terminating Williamson's employment were a pretext for unlawful disability discrimination. Plaintiff has not shown that CCDHR treated him less favorably than any other employee with similar performance problems and policy violations. Summary judgment is properly granted on plaintiff's disability discrimination claims on that ground, as well.

-17-